## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KINDRED HOSPITALS EAST,  )
LLC d/b/a KINDRED HOSPITAL  )
BAY AREA – TAMPA  )
                        )
    Plaintiff,  )
v.  )     **CASE NO. 8:23-cv-01075**
MEDICAL MUTUAL  )
SERVICES, LLC  )
                        )
    Defendant.  )

## FIRST AMENDED COMPLAINT FOR FRAUDULENT MISREPRESENTATION, FRAUDULENT CONCEALMENT, NEGLIGENT MISREPRESENTATION, FALSE INFORMATION NEGLIGENTLY SUPPLIED FOR THE GUIDANCE OF OTHERS, PROMISSORY ESTOPPEL, BREACH OF WRITTEN CONTRACT, AND BREACH OF IMPLIED IN FACT CONTRACT

Pursuant to the Court's Order granting Defendant's Motion to Dismiss with leave to amend (DN-34), plaintiff Kindred Hospitals East, L.L.C., d/b/a Kindred Hospital Bay Area - Tampa ("Kindred"), by and through its undersigned counsel, sues defendant Medical Mutual Services, LLC ("Medical Mutual") and alleges as follows:

## GENERAL ALLEGATIONS

1.      This is an action for damages in excess of $600,000.00, exclusive of interest, costs, and attorneys' fees, arising from Medical Mutual's misrepresentations and concealments regarding insurance coverage and the terms

of payment for a Medical Mutual insured (the "Insured"), who will not be identified herein for purposes of patient privacy.  Medical Mutual also breached express or implied contractual obligations with respect to the Insured.

2.      In reliance on Medical Mutual's verification of insurance coverage and preauthorization of services to be provided, Kindred admitted the Insured into its hospital and provided him with care and treatment.

3.      When Kindred billed Medical Mutual in the ordinary course, however, Kindred was not paid in accordance with Medical Mutual's pre-admission representations.

4.      Kindred is a party to a contract with First Health, a third party network.  Pursuant to the terms of Kindred's First Health contract, Kindred agrees to provide care and treatment to members or insureds of third party administrators, insurance companies and other payors that are also contracted with First Health. It further agrees to accept a discounted rate as full payment for said care and treatment, in this case 80 percent of billed charges, and not to balance bill those members or even bill them at all if the underlying payor is responsible for the charges despite any lack of payment.

5.      First Health, in turn, also contracts with insurers, third party administrators and other payors like Medical Mutual. As part of Medical Mutual's contract with First Health, Medical Mutual agreed to compensate Kindred and other contracted providers for care and treatment of Medical Mutual's members at

2

the rates set forth in the providers' respective contracts with First Health within 30 days of receipt of a claim from the provider.

6.    The contract rates are provided to the payors, like Medical Mutual, by First Health. In that regard, under Medical Mutual's First Health contract, First Health reprices provider claims and then advises Medical Mutual of the amount that must be paid. First Health did so in this case, advising Medical Mutual that Kindred's contract rate was 80 percent of billed charges.

7.    These First Health contracts, while separate, are designed to be construed together.  Contracting of payors and providers through First Health and other third party networks in this manner is a custom and practice in the healthcare industry. Insurers and other payors obtain the benefit of in-network discounts and member protections if no direct contract with a provider exists, and providers obtain "steerage" of patients to in-network providers and prompt payment.

8.    As a result of Medical Mutual's misrepresentations and breaches, Kindred has sustained damages in an amount exceeding $600,000.00, exclusive of interest.

9.    Plaintiff Kindred Hospitals East, L.L.C is a Delaware limited liability company doing business throughout Florida.

10.   Defendant Medical Mutual is an Ohio limited liability company registered to conduct business in Florida and conducting business in Florida, with its corporate headquarters in Cleveland, Ohio.

3

11.    This complaint was initiated in Hillsborough County Circuit Court pursuant to § 26.012 and § 48.193, Florida Statutes, and was removed to this Court by Medical Mutual on the basis of diversity jurisdiction.

## FACTUAL BACKGROUND

A.    *The Insured Has a Devastating Stroke.*

12.    On February 12, 2018, the Insured, who had theretofore lived independently, presented at an emergency room of an unidentified hospital with dysarthria and facial drop. A CT scan was administered and was normal. As such, TPA, a drug used to break up blood clots and restore blood flow to the brain, was deferred.

13.    The Insured was transferred to another short term acute care hospital ("STAC"),[1] and on the way there, the Insured's condition worsened. The Insured had an emergency thrombectomy, and was thereafter extubated, but the Insured's respiratory condition declined and the Insured was intubated emergently the next day.

14.    The Insured was ultimately determined to have suffered an acute ischemic stroke, with basilar occlusion and right vertebral occlusion. The stroke caused severe injury to the Insured's brain, leaving the Insured unresponsive and unable to follow commands.

---

[1] Neither the Insured's name nor the hospitals the Insured was treated at prior to Kindred are identified for purposes of patient privacy. However, these details have been provided, and are otherwise well known, to Medical Mutual.

4

15.    According to family members, the Insured had previously been healthy. Given the Insured's prior health and independence, and relatively young age, the Insured's family was hopeful the Insured would recover.

16.    It can take months or years for patients with severe brain injuries to recover.  Even when a patient is comatose or in a persistent vegetative state, many of those patients regain awareness four months or more after the initial brain injury.

17.    Thus, even though the Insured's neurologist advised the family of the Insured's poor prognosis, the family wanted the Insured to receive aggressive treatment and chose to maintain the Insured on full code status. Medical Mutual was well aware of these facts based on its ongoing communications with the STAC.

18.    The Insured was treated in the STAC's Intensive Care Unit for over two weeks, at which point he was still undergoing vent weaning efforts and required other acute interventions. Realizing the Insured would require a longer acute hospitalization than it was set up to provide, the STAC sought to discharge the Insured into a long term acute care ("LTAC") hospital. The STAC thus sent a referral to Kindred on February 26, 2018.

19.    Upon receiving the STAC's referral on February 26, 2018, Christopher Wilson, a clinical liaison for Kindred, assessed the Insured to ensure

the Insured met clinical criteria for admission to Kindred and determined that the Insured did meet LTAC criteria for admission.

20.    The Insured, however, was not then ready for discharge from the STAC.

21.    When the Insured's physicians at the STAC determined that he was ready for discharge to an LTAC hospital, Alison Foster, a case manager at the STAC, spoke with Jean, a nurse case manager at Medical Mutual, on March 2, 2018, discussing the Insured's conditions at length and advising her the Insured needed to be discharged into an LTAC hospital.

22.    Jean told Ms. Foster during this conversation that Medical Mutual had determined that Kindred was an in-network provider. Ms. Foster advised Jean that she was sending clinical updates to Kindred on an ongoing basis, and that Kindred would submit a request for authorization and approval for transfer.

B.    *What is Kindred?*

23.    Kindred's LTAC hospitals provide care and treatment to the sickest of the sick – patients who require intensive treatment for an extended period of time that a short term acute care hospital is not equipped to provide.

24.    LTAC hospitals are licensed as general acute care hospitals and accredited by the Joint Commission as such. However, unlike STAC hospitals, LTAC hospitals have no emergency rooms and are not required by law to accept

any patients for admission. Under Medicare guidelines, their average length of stay exceeds 25 days; many stays are much longer.

25.    Due to the intensity of services provided at LTAC hospitals and their average lengths of stay, LTAC hospital care is expensive. Moreover, once a patient has been admitted into an LTAC hospital, that patient cannot be discharged unless there is a safe discharge option and a physician discharge order.

26.    For these reasons, before a patient is admitted, Kindred verifies coverage with the insurance company or third party administrator to ensure there is insurance coverage and that its claims will be paid.  If there is an issue with coverage or the amount to be paid, Kindred will not admit the patient.

<b>C.</b>    <i>Kindred Verifies Coverage and Seeks Authorization</i>

27.    On March 5, 2018, Mary Lubin of Kindred called Medical Mutual at 1-800-636-3621 to verify the Insured's eligibility for coverage and the terms of payment, speaking with Abby.

28.    During that conversation, Abby told Ms. Lubin that the Insured had coverage through Medical Mutual and that Medical Mutual was contracted with, and paid in accordance with, the First Health network.

29.    Abby further confirmed that the Insured was not covered by Medicare, and stated that when the Insured did become active with Medicare, Blue Cross would be the active policy, not Medical Mutual.

7

30.     According to Abby, for in-network providers, meaning those providers also contracted with First Health, once a $400 deductible had been satisfied, Medical Mutual would pay 90 percent of the First Health contract rate until the $800 out-of-pocket maximum was met, at which point Medical Mutual would pay 100 percent of the First Health contract rate.

31.     Abby further told Ms. Lubin that no portion of the deductible or out-of-pocket maximum had yet been met.  But given the STAC admission that was approaching its fourth week at the time of Ms. Lubin's conversation with Abby, Kindred knew they both would be fully met by the time Kindred billed its claims for its care and treatment of the Insured.

32.     Abby provided Ms. Lubin with the telephone number for First Health so she could confirm that Kindred was in-network with First Health, which it was.

33.     As such, based on Ms. Lubin's conversation with Abby, Kindred knew it would receive payment at 100 percent of the rate in its First Health contract for its care and treatment of the Insured, which was 80 percent of Kindred's billed charges.

34.     During the verification conversation, Abby did not disclose any pre-existing clauses, exclusions or other conditions, exceptions or provisions that could adversely impact payment for Kindred's services.

35.     In response to Kindred's question, Abby further advised pre-authorization for the admission was required and provided a fax number for

8

Kindred to use to obtain that pre-authorization. Abby also advised that clinical updates were required on a weekly basis throughout the hospitalization. This let Kindred know that Medical Mutual would continue to review the care being provided for medical necessity and would pay for all care that was medically necessary.

36.     Thus, based on Abby's representations, as well as custom and practice in the healthcare industry, Kindred reasonably believed care would continue to be authorized and Kindred would continue to receive payment at the First Health contract rate as long as the care continued to meet LTAC clinical criteria or was otherwise medically necessary.

37.     On March 5, 2018, Toni Gaither of Kindred updated Kindred's clinical assessment of the Insured's condition to ensure clinical criteria for LTAC admission continued to be met, which it did.

38.     After this clinical assessment was completed, also on March 5, 2018, at 5:02 p.m., Jo Dee McVea LaBombard of Kindred sent a 45-page fax to Medical Mutual with Kindred's internal assessment of clinical acuity for the contemplated LTAC hospital admission, along with medical records from the STAC, in order to obtain authorization for the admission.

D.    *Medical Mutual Denies Authorization for, and then Authorizes, the Kindred Admission*

39.    Following receipt of the Kindred fax, Medical Mutual nurse reviewer, Alicia Piotrowski, spoke with Ms. Foster, nurse case manager at the STAC. In response to Ms. Piotrowski's questions, Ms. Foster advised Ms. Piotrowski that the Insured had only been living in Florida a brief time and that the Insured's only family in Florida was a daughter; the rest of the family was in Ohio. Ms. Foster also told Ms. Piotrowski that the STAC was a "short term hospital" and had the Insured "stable enough to be transferred."

40.    In considering whether to approve the admission, Ms. Piotrowski identified as possible red flags the Insured's limited family in Florida, along with the Insured's poor prognosis, that the Insured's family wanted everything done, and that the family had refused palliative care. A later "red flag" identified by Medical Mutual in its internal notes was that the Insured was in a vegetative condition.

41.    On March 6, 2018, Lisa at Medical Mutual sent a two-page fax to Ms. LaBombard advising her that authorization for the admission had been denied. According to Medical Mutual, "the information provided does not indicate [the Insured] has failed vent weaning trials at the hospital" and was "receiving IV medicine to control blood pressure." In other words, Medical Mutual believed the Insured continued to require acute hospital care.

42.     On March 7, 2018, the STAC's case manager for the Insured, Ms. Foster, sent a 38-page fax to Medical Mutual, attaching updates and highlighting areas where "the reported lack of info is noted."  Ms. Foster stated that the Insured's physician, Gary Dale, MD, would be contacting Medical Mutual for a peer to peer review the next day.

43.     The fax attached a physician progress note from Dr. Dale stating "Case manager indicated that the insurance company apparently declined transfer to LTAC. The reason for this seems to be quite baffling as patient clearly has a need for this."

44.     The fax also detailed the Insured's multiple medical conditions and issues and noted his "[p]oor prognosis for return of daily function," but also specifically stated that the family was maintaining full code status and wanted "all aggressive care to continue."  The Insured's unresponsiveness and inability to follow commands was noted throughout the fax.

45.     Medical Mutual treated Ms. Foster's fax as an expedited appeal and told Dr. Dale when he called that the peer to peer review would not go forward.

46.     Under usual custom and practice in the healthcare industry, a nurse reviewer generally performs the first clinical review, applying objective criteria like InterQual or MCG to determine whether clinical criteria for the requested care is met. If the nurse case reviewer finds clinical criteria are met, that is generally the end of the story: the care is deemed approved.

11

47.    However, if the nurse case reviewer's conclusion is that the requested care does *not* meet clinical criteria, a medical director then has to review the case to determine whether medical necessity exists regardless of the nurse's findings.

48.    In reviewing the Insured's clinical information, Medical Mutual applied InterQual criteria for LTAC care. According to an internal note dated March 9, 2018, Medical Mutual nurse reviewer Kristen Chmielewski found that the Insured in fact met criteria for LTAC admission.

49.    But this was not the end of the story. Per a meeting Ms. Chmielewski had attended earlier in the day with various Medical Mutual higher-ups – including management personnel who should not have been involved in utilization review decisions at all per applicable law – the normal process was not to be followed with respect to the Insured. As noted by Ms. Chmielewski:

> Per Medical Director (Chen) and Management (Nosker/Nadzam) discussion this afternoon ALL reviews for this acute admit and any subsequent admits or request for admit (SNF, etc.) for [the Insured] need to be sent to Dr. Conwell for review. Even if the member meets criteria-please send.

50.    Medical Mutual reversed its denial decision and provided written authorization, via a letter addressed to Kindred generally from Ms. Chmielewski dated March 9, 2018, and a separate fax to Jody at Kindred dated March 12, 2018, for the Insured to be admitted into Kindred's LTAC hospital in Tampa for

continued close monitoring and medical management of his complicated medical conditions, including ventilator management and weaning efforts, IV antibiotics to address his numerous infections, as well as various rehabilitation therapies and other interventions to address his numerous comorbidities.

51.    What Medical Mutual did not do, however, was advise Kindred of what it perceived to be "red flags" with respect to the Insured or that the usual process for concurrent review was not to be followed with respect to the Insured. Despite its written communications to Kindred, Medical Mutual did not mention that Medical Mutual's medical director, Dr. Conwell, was going to have the final say on utilization review decisions on a going forward basis regardless of whether InterQual criteria for continuing LTAC care were met.

E.    *Kindred Admits and Treats the Insured*

52.    Unaware of this information, Kindred reasonably believed this was a routine admission and that Medical Mutual would cover and pay for all care that met LTAC criteria for continuing care or was otherwise medically necessary. In reliance on Medical Mutual's representations, Kindred admitted the Insured on March 13, 2018.  Crystal Sprouse of Kindred provided notification to Ms. Chmielewski of the admission via a fax dated March 13, 2018.

53.    After the Insured was admitted, Kindred's case manager, Ms. Sprouse, continued to send ongoing clinical updates to Medical Mutual, which continued to authorize the care being provided.

54.     According to Medical Mutual's internal notes, which Kindred did not see or have knowledge of before this action was filed, the continuing care was authorized largely due to Kindred's ongoing efforts to wean the Insured from the ventilator. Even though a patient meets criteria for continuing LTAC hospitalization if he or she meets any of four InterQual subsets – vent weaning, medically complex, respiratory complex or wound care – Medical Mutual's nurse case manager applied only the vent weaning criteria.

F.    *Medical Mutual Suddenly Cuts off Coverage*

55.     After one month, even though Kindred's weaning efforts continued when the Insured was medically able to tolerate them, Medical Mutual purported to cut off coverage.

56.     According to its denial letter dated April 16, 2018, that was signed by Lisa Hilton in Medical Mutual's case management department, the ostensible basis for this decision was that "[t]here have been no further attempts to wean you from the ventilator. Further treatment could be provided at a ventilator capable skilled nursing facility."

57.     This was despite the fact that the day before the denial, the Insured had undergone intensive weaning trials, and was able to tolerate a full 12 hours on a trach collar without the assistance of the ventilator. This was also despite the fact that, as Medical Mutual well knew, no such "ventilator capable skilled nursing facility" existed in the entire State of Florida.

14

58.    Medical Mutual's internal notes reflect that Medical Mutual purported to base its denial, at least in part, on its contention that the Insured's mental status had declined. But this was not true either. And Molina did not include this alleged basis in its denial letter.

59.    Around the time of this initial denial, Medical Mutual's internal notes, again written by Ms. Chmielewski, reflect that a "high dollar" meeting had occurred with a follow-up meeting scheduled for April 24. Not surprisingly, no one at Medical Mutual told Kindred about this meeting.

G.    *Kindred Continued to Provide the Insured with Necessary Care*

60.    Given the lack of a safe discharge option, Kindred advised Medical Mutual that its goal was to discharge the Insured to a lower level of care after weaning him from the ventilator to a trach collar. Under InterQual criteria, if no safe discharge option exists, discharge screens are not met and continuing stay criteria are met for that reason alone.

61.    Kindred thereafter continued to send Medical Mutual continuing clinical updates, which Medical Mutual largely declined to review. Medical Mutual even told Kindred further updates were not necessary, but Kindred continued to send them so Medical Mutual was aware at all times of the intensity of services being provided to the Insured.

62.    After Medical Mutual's denial, the Insured developed recurrent pneumonias and was ordered and administered IV antibiotics. The Insured further

required and received complex wound care. This intensity of services, in and of themselves, justified continuing LTAC care.  But Medical Mutual refused to reverse its denial and, internally at least, characterized the care as custodial.

63.    This ostensible basis for denial was not included in a separate denial letter sent in response to a Kindred appeal on June 18, 2018, which merely parroted the prior contention that there had not been further efforts to wean the Insured from the ventilator, even though this was, as Medical Mutual well knew, untrue. This is likely because it made no sense. No less a source than the United States government defines "custodial care" as "[n]onskilled, personal care, such as help with activities of daily living like bathing, dressing, eating, getting in or out of a bed or chair, moving round, and using the bathroom."

64.    The Insured, however, required medical care essential to his very survival that could only be carried out by skilled personnel like physicians, respiratory therapists, and nurses, not simply assistance with the activities of daily living that could be provided by anyone.

65.    During the denied dates of service, despite the Insured's infections and inherent instability, Kindred succeeded in its goal of weaning the Insured to a trach collar. As such, on August 9, 2018, it was finally able to discharge the Insured to a lower level of care.

66.    InterQual clinical criteria for continuing LTAC hospitalization were met for the entire admission. In addition, until Kindred was able to secure a safe

discharge option for the Insured, discharge screens were not met and hence criteria for continued LTAC admission were met for this reason as well.

H. *Medical Mutual Delays the Adjudication of Kindred's Claims*

67.    Kindred submitted interim claims to Medical Mutual in the ordinary course. On July 5, 2018, three months after submission of Kindred's first interim claim, Medical Mutual paid Kindred's claim for dates of service March 13 through 31, 2018, at the rate in Kindred's First Health contract, 80 percent of billed charges.

68.    However, Medical Mutual failed to pay or otherwise adjudicate Kindred's other interim claims. Instead, in September 2018, Medical Mutual instructed Kindred to submit medical records in order to have its claims reviewed for payment.

69.    Kindred complied with Medical Mutual's request for medical records and continued to follow up with Medical Mutual on the status of its claims over the next several months. Each time, Kindred was advised that the claims were still in review.

70.    Finally, on April 25, 2019, Kindred received an Explanation of Benefits from Medical Mutual, indicating it would not pay anything at all for care and treatment provided to the Insured from April 17, 2018, through August 9, 2018, on the alleged ground that the care provided to the Insured was merely

"custodial" – the first time this ostensible basis for denial was set forth in writing or otherwise conveyed to Kindred.

71.    For reasons that are unclear, given the 30-day payment provision in its contract with First Health, Medical Mutual did not pay for authorized dates of service April 1 through April 15, 2018, until June 19, 2019, at which time it paid for these services at the First Health contract rate of 80 percent of billed charges.

72.    Also for reasons that are unclear, Medical Mutual never paid for authorized date of service April 16, 2018.

73.    Kindred appealed Medical Mutual's denial of payment later that year, but Medical Mutual did not respond to this appeal. Kindred then retained counsel in an attempt to obtain the payment due and owing for the Insured's care, which was not custodial care, but medically necessary long-term acute care.

74.    In the letter written by counsel, Kindred pointed out that if Medical Mutual's position was that the Insured's poor prognosis meant he was not entitled to the skilled care he required to survive, such a position violated the Patient Protection and Affordable Care Act, which includes hospitalization as an "essential health benefit" and prohibits coverage denials against the wishes of patients (or persons acting on their behalf) made on the basis of the "expected length of life or of the individuals' present or predicted disability, degree of medical dependency or quality of life."

75.    On March 11, 2021, Medical Mutual advised Kindred, through its counsel, that no payment would be made for nearly four months of care and treatment Kindred provided to the Insured in good faith because, according to Medical Mutual, "successful weaning was no longer expected." No mention was made of Medical Mutual's prior custodial determination or of the fact that the Insured had ultimately been weaned to a trach collar consistent with Kindred's goal.

76.    Kindred had never before been advised that Medical Mutual would *only* pay for the Insured's care and treatment if he could be expected to successfully wean from a ventilator, regardless of whether other standard criteria for medical necessity were met.  Kindred also was never advised that Medical Mutual had flagged the Insured as a special case and imposed different requirements for the Insured with respect to utilization review compared to other Medical Mutual members.

77.    As evidenced by its factually inaccurate and varying bases for denial, its "high dollar" meetings to discuss the Insured, and its "special handling" of the Insured in a manner different from other enrollees, it is clear that Medical Mutual recognized the Insured as a "high dollar" case from the outset and at all times intended to cut off coverage if the Insured was not weaned from the ventilator within a brief period of time or did not experience marked neurological

19

improvement, regardless of whether clinical criteria for continuing LTAC admission were met. In other words, only two months after his stroke – a very brief time-table to expect weaning or significant neurological improvement – Medical Mutual had written off the Insured, believing he was not entitled to the care he required to survive and potentially improve.

78.     Kindred would not have admitted or treated the Insured if it had been advised of Medical Mutual's true positions, which are at odds with standard practice in evaluating medical necessity and applicable law.

79.     As a result of Medical Mutual's misrepresentations and concealments regarding its intent to pay for the Insured's care and treatment, Kindred has suffered damages in an amount exceeding $600,000.00, insofar as, among other things, it provided care and treatment to the Insured for which it has not been compensated, was deprived of interest income on those amounts during this period of non-payment, and lost opportunity costs associated with its treatment of the Insured rather than other patients.

## COUNT I – FRAUDULENT MISREPRESENTATION

80.     Kindred repeats and realleges the allegations contained in paragraphs 1 through 79, inclusive, and incorporates the same as though set forth in full.

81.     Prior to the Insured's admission, on March 5, 2018, Mary Lubin of Kindred called Medical Mutual at 1-800-636-3621 to verify the Insured's eligibility for coverage and the terms of payment, speaking with Abby.  During

that conversation, Abby confirmed the Insured was eligible for coverage and that Kindred would receive payment at its First Health contract rate (80 percent of billed charges) for its care and treatment of the Insured. Abby did not disclose any exclusions or other factors that could possibly impact the payment Kindred would receive for its care and treatment of the Insured.

82.    In response to Kindred's question, Abby further advised pre-authorization for the admission was required and provided a fax number for Kindred to use to obtain that pre-authorization. Abby also advised that clinical updates were required on a weekly basis throughout the hospitalization.

83.    Also on March 5, 2018, at 5:02 p.m., Jo Dee McVea LaBombard of Kindred sent a 45-page fax to Medical Mutual with Kindred's internal assessment of clinical acuity for the contemplated LTAC hospital admission, along with medical records from the STAC, in order to obtain authorization for the admission. While Medical Mutual initially denied authorization for the admission on the grounds that the Insured still required acute hospital care and could receive it at the STAC, it reversed this denial and authorized the admission to Kindred via authorization no. 1180650800 in at least two separate written communications. This authorization was not qualified in any manner.

84.    At the time the Insured was referred to Kindred for treatment, Medical Mutual was well aware of the Insured's medical condition and poor prognosis. It was also well aware that the Insured's family members were unshakeable in their

strong conviction that the Insured would recover and refused to consider palliative care or hospice, and instead chose to maintain the Insured on full code status.

85.     Medical Mutual knew brain injuries could take months if not years to recover from and that the Insured was thus a high dollar case. Thus, Medical Mutual determined to handle the Insured differently from other members in that it would authorize only a certain number of days of care at Kindred for vent weaning and cut off authorization if vent weaning was no longer expected to occur or if the Insured did not swiftly show marked neurological improvement, even if no safe discharge option for the Insured existed at the time of the preordained denial of coverage and regardless of whether other standard criteria for medical necessity were present.

86.     Yet it failed to disclose these material facts to Kindred during the verification and authorization communications prior to admission.

87.     Thus, based on Medical Mutual's representations, in conjunction with custom and practice in the healthcare industry, Kindred reasonably believed care would continue to be authorized and Kindred would continue to receive payment at the First Health contract rate as long as the care continued to meet LTAC clinical criteria or was otherwise medically necessary. As such, in reliance on those representations, Kindred admitted the Insured into its hospital and provided him with medical care and treatment.

88.    Based on Medical Mutual's current positions, Medical Mutual's representations at the time of the Insured's admission were false, and Medical Mutual knew that they were false or was recklessly indifferent to their falsity when it made them.  Kindred is informed and believes, and on that basis alleges, that Medical Mutual at all times intended to cut off coverage after a specific period of time if the Insured had not been weaned from the ventilator or had not otherwise shown marked neurological improvement, even if criteria for continuing LTAC admission were met and the care was otherwise medically necessary.

89.    Kindred is informed and believes, and on that basis alleges, that Medical Mutual verified coverage and the terms of payment so that Kindred would provide care and treatment to the Insured and with the intent that Kindred would rely upon the misrepresentations to its detriment. In that regard, Medical Medical knew that once admitted to Kindred, the Insured could not be discharged, regardless of whether Medical Mutual paid for the Insured's care, until there was a safe discharge option and a physician discharge order. In this way, Medical Mutual could ensure the Insured received the treatment he required while not actually paying for that care without facing arguments or legal threats from either the STAC or the Insured's family members.

90.    In reliance on Medical Mutual's misrepresentations, Kindred admitted the Insured and provided him with care and treatment. Kindred's reliance was justifiable in light of Medical Mutual's representations as to coverage and the

terms of payment.  Medical Mutual had superior knowledge regarding the facts and circumstances of the Insured's coverage and the terms under which Medical Mutual would make payment, and Kindred relied on Medical Mutual to disclose any facts that could potentially impact payment to Kindred.  Medical Mutual did not disclose that it would not pay anything for the Insured's care and treatment unless he was expected to wean from a ventilator, or that it deemed the Insured's care custodial given the Insured's severe brain injury, until long after the Insured had received care and treatment from Kindred.

91.    Kindred did not and could not have known of the falsity of Medical Mutual's representations, and it would not have admitted the Insured had it known that Medical Mutual had misrepresented these and other material facts.

92.    As a direct and proximate result of Medical Mutual's fraudulent representations and concealments, Kindred has suffered damages in an amount exceeding $600,000.00, insofar as, among other things, it provided care and treatment to the Insured for which it has not been compensated, was deprived of interest income on those amounts during this period of non-payment, and lost opportunity costs associated with its treatment of the Insured rather than other patients.

93.    Medical Mutual has acted with despicable conduct and with a conscious disregard of the rights of Kindred by making the foregoing misrepresentations and concealing material facts.  Kindred is therefore entitled to

recover exemplary and punitive damages from Medical Mutual in an amount that is fair and reasonable.

WHEREFORE, Kindred prays for an Order of this Court awarding it fair and reasonable damages against Medical Mutual in an amount exceeding $600,000.00 to be proven at trial, all pre-judgment and post-judgment interest on the above amounts at the maximum rate permitted by law, its costs and attorneys' fees incurred herein to the extent permitted by law, punitive damages, and such other and further relief as the Court deems just and proper.

### <u>COUNT II – NEGLIGENT MISREPRESENTATION</u>

94.     Except where inconsistent with the following allegations, Kindred repeats and realleges the allegations contained in paragraphs 1 through 79, inclusive, and incorporates the same as though set forth in full.

95.     Prior to the Insured's admission, on March 5, 2018, Mary Lubin of Kindred called Medical Mutual at 1-800-636-3621 to verify the Insured's eligibility for coverage and the terms of payment, speaking with Abby.  During that conversation, Abby confirmed the Insured was eligible for coverage and that Kindred would receive payment at its First Health contract rate for its care and treatment of the Insured. Abby did not disclose any exclusions or other factors that could possibly impact the payment Kindred would receive for its care and treatment of the Insured.

96.    In response to Kindred's question, Abby further advised pre-authorization for the admission was required and provided a fax number for Kindred to use to obtain that pre-authorization. Abby also advised that clinical updates were required on a weekly basis throughout the hospitalization.

97.    Also on March 5, 2018, at 5:02 p.m., Jo Dee McVea LaBombard of Kindred sent a 45-page fax to Medical Mutual with Kindred's internal assessment of clinical acuity for the contemplated LTAC hospital admission, along with medical records from the STAC, in order to obtain authorization for the admission. While Medical Mutual initially denied authorization for the admission on the grounds that the Insured still required acute hospital care and could receive it at the STAC, it reversed this denial and authorized the admission to Kindred via authorization no. 1180650800. This authorization was not qualified in any manner.

98.    At no time during any of Kindred's communications with Medical Mutual did Medical Mutual advise it that it was handling the Insured differently than other members and that it would cut off coverage within a specific and brief period of time if the Insured had not been weaned from the ventilator (or was not expected to wean from the ventilator) or had not shown marked neurological improvement, regardless of whether other standard criteria for medical necessity were present.

99.    Thus, based on Medical Mutual's representations, in conjunction with custom and practice in the healthcare industry, Kindred reasonably believed care

would continue to be authorized and Kindred would continue to receive payment at the First Health contract rate as long as the care continued to meet LTAC clinical criteria or was otherwise medically necessary. As such, in reliance on those representations, Kindred admitted the Insured into its hospital and provided him with medical care and treatment.

100.   Based on Medical Mutual's current position, its pre-admission representations were in fact false insofar as it intended to cut off coverage based on factors other than whether other standard criteria for medical necessity were present. Medical Mutual was negligent in making its representations because, based on its internal meetings, superior knowledge of its own business records and policies, and its easy access to those policies and records, it should have known its unqualified statements were false.

101.   In making the foregoing misrepresentations to Kindred, Medical Mutual intended and expected that Kindred would rely on its statements.  Indeed, Medical Mutual is well aware that Kindred routinely contacts insurers to determine the existence and terms of coverage and authorization for the admission in order to decide whether to admit a particular patient.  Kindred is informed and believes, and on that basis alleges, that Medical Mutual advised Kindred that the Insured was covered and the admission was authorized, with no limitations or qualifications, so that Kindred would admit the Insured and provide him with care and treatment.

102.   In this regard, Medical Medical knew that once admitted to Kindred, the Insured could not be discharged, regardless of whether Medical Mutual paid for the Insured's care, until there was a safe discharge option and a physician discharge order. In this way, Medical Mutual could ensure the Insured received the treatment he required while not actually paying for that care without facing arguments or legal threats from either the STAC or the Insured's family members.

103.   In reliance on Medical Mutual's misrepresentations, Kindred admitted the Insured into its hospital and provided him with care and treatment.  Kindred's reliance was justifiable in light of Medical Mutual's representations as to coverage, authorization, and the terms of payment.  Medical Mutual had superior knowledge regarding the facts and circumstances of the Insured's coverage, including the terms under which Medical Mutual would make payment, and Kindred relied on Medical Mutual to disclose any facts that could potentially impact payment to Kindred.

104.   Kindred was ignorant of the true facts and did not have an equal opportunity to discover them insofar as it was merely a third-party health care provider.  As a result, a relationship of trust and confidence existed between Kindred and Medical Mutual, such that Medical Mutual had a duty to convey the true facts regarding the Insured's coverage.  Yet Medical Mutual misrepresented the circumstances of coverage and payment to Kindred, and did not reveal that it was treating the Insured as a special case and would only pay for the Insured's care

and treatment if certain metrics were reached, regardless of whether other standard criteria for medical necessity were present, until long after the Insured had received the care and treatment he required from Kindred.

105.    Kindred did not and could not have known of the falsity of Medical Mutual's representations, and it would not have admitted the Insured had it known that Medical Mutual had misrepresented these and other material facts.

106.    As a direct and proximate result of Medical Mutual's representations and omissions, Kindred has suffered damages in an amount exceeding $600,000.00, insofar as, among other things, it provided care and treatment to the Insured for which it has not been compensated, was deprived of interest income on those amounts during this period of non-payment, and lost opportunity costs associated with its treatment of the Insured rather than other patients.

WHEREFORE, Kindred prays for an Order of this Court awarding it fair and reasonable damages against Medical Mutual in an amount exceeding $600,000.00 to be proven at trial, all pre-judgment and post-judgment interest on the above amounts at the maximum rate permitted by law, its costs and attorneys' fees incurred herein to the extent permitted by law, and such other and further relief as the Court deems just and proper.

## COUNT III – FRAUDULENT CONCEALMENT

107.    Kindred repeats and realleges the allegations contained in paragraphs 1 through 79, inclusive, and incorporates the same as though set forth in full.

108.  Prior to the Insured's admission, on March 5, 2018, Mary Lubin of Kindred called Medical Mutual at 1-800-636-3621 to verify the Insured's eligibility for coverage and the terms of payment, speaking with Abby.  During that conversation, Abby confirmed the Insured was eligible for coverage and that Kindred would receive payment at its First Health contract rate (80 percent of billed charges) for its care and treatment of the Insured. Abby did not disclose any exclusions or other factors that could possibly impact the payment Kindred would receive for its care and treatment of the Insured.

109.  In response to Kindred's question, Abby further advised pre-authorization for the admission was required and provided a fax number for Kindred to use to obtain that pre-authorization. Abby also advised that clinical updates were required on a weekly basis throughout the hospitalization.

110.  Also on March 5, 2018, at 5:02 p.m., Jo Dee McVea LaBombard of Kindred sent a 45-page fax to Medical Mutual with Kindred's internal assessment of clinical acuity for the contemplated LTAC hospital admission, along with medical records from the STAC, in order to obtain authorization for the admission. While Medical Mutual initially denied authorization for the admission on the grounds that the Insured still required acute hospital care and could receive it at the STAC, it reversed this denial and authorized the admission to Kindred via authorization no. 1180650800 in at least two separate written communications. This authorization was not qualified in any manner.

30

111.   At the time the Insured was referred to Kindred for treatment, Medical Mutual was well aware of the Insured's medical condition and poor prognosis. It was also well aware that the Insured's family members were unshakeable in their strong conviction that the Insured would recover and refused to consider palliative care or hospice, and instead chose to maintain the Insured on full code status.

112.   Medical Mutual knew brain injuries could take months if not years to recover from and that the Insured was thus a high dollar case. Thus, Medical Mutual determined to handle the Insured differently from other members in that it would authorize only a certain number of days of care at Kindred for vent weaning and cut off authorization if vent weaning was no longer expected to occur or the Insured did not swiftly show marked neurological improvement, even if no safe discharge option for the Insured existed at the time of the preordained denial of coverage and regardless of whether other standard criteria for medical necessity were present.

113.   These were material facts that Medical Mutual knew or should have known should have been disclosed to Kindred. Yet Medical Mutual failed to disclose these material facts to Kindred during the verification and authorization communications prior to admission or at any other time during the admission.

114.   In making its pre-admission representations regarding coverage, authorization, and payment, Medical Mutual knew Kindred would reasonably be induced to rely on such representations, in that it would admit the Insured into its

LTAC hospital and provide him with necessary medical care and treatment. Medical Mutual intentionally concealed the foregoing material facts because it knew that Kindred would not admit or treat the Insured if these material facts were revealed.

115.   Thus, based on Medical Mutual's representations, in conjunction with custom and practice in the healthcare industry, Kindred reasonably believed care would continue to be authorized and Kindred would continue to receive payment at the First Health contract rate as long as the care continued to meet LTAC clinical criteria or was otherwise medically necessary. As such, in reliance on those representations, Kindred admitted the Insured into its facility and provided him with medical care and treatment.

116.   Kindred's reliance was justifiable in light of Medical Mutual's representations as to coverage, authorization, and the terms of payment.  Medical Mutual had superior knowledge regarding the facts and circumstances of the Insured's coverage, including the terms under which Medical Mutual would make payment, and Kindred relied on Medical Mutual to disclose any facts that could potentially impact payment to Kindred.

117.   Kindred was ignorant of the true facts and did not have an equal opportunity to discover them insofar as it was merely a third-party health care provider.  As a result, a relationship of trust and confidence existed between Kindred and Medical Mutual, such that Medical Mutual had a duty to convey the

true facts regarding the Insured's coverage. Yet Medical Mutual concealed the material facts that it intended to allow only a specific period of time for Kindred to wean the Insured from the ventilator, and would not pay for care if the Insured was no longer expected to be weaned from the ventilator or if his neurological status did not quickly improve, regardless of whether other standard criteria for medical necessity were present, and did not reveal these facts until long after the Insured's discharge.

118.   As a direct and proximate result of Medical Mutual's fraudulent concealments, Kindred has suffered damages in an amount exceeding $600,000.00, insofar as, among other things, it provided care and treatment to the Insured for which it has not been compensated, was deprived of interest income on those amounts during this period of non-payment, and lost opportunity costs associated with its treatment of the Insured rather than other patients.

119.   Medical Mutual has acted with despicable conduct and with a conscious disregard of the rights of Kindred by concealing the foregoing material facts. Kindred is therefore entitled to recover exemplary and punitive damages from Medical Mutual in an amount that is fair and reasonable.

WHEREFORE, Kindred prays for an Order of this Court awarding it fair and reasonable damages against Medical Mutual in an amount exceeding $600,000.00 to be proven at trial, all pre-judgment and post-judgment interest on the above amounts at the maximum rate permitted by law, its costs and attorneys'

fees incurred herein to the extent permitted by law, punitive damages, and such other and further relief as the Court deems just and proper.

## COUNT IV – FALSE INFORMATION NEGLIGENTLY SUPPLIED FOR THE GUIDANCE OF OTHERS

120.   Kindred repeats and realleges the allegations contained in paragraphs 1 through 79, inclusive, and incorporates the same as though set forth in full.

121.   Prior to the Insured's admission, on March 5, 2018, Mary Lubin of Kindred called Medical Mutual at 1-800-636-3621 to verify the Insured's eligibility for coverage and the terms of payment, speaking with Abby.  During that conversation, Abby confirmed the Insured was eligible for coverage and that Kindred would receive payment at its First Health contract rate for its care and treatment of the Insured. Abby did not disclose any exclusions or other factors that could possibly impact the payment Kindred would receive for its care and treatment of the Insured.

122.   In response to Kindred's question, Abby further advised pre-authorization for the admission was required and provided a fax number for Kindred to use to obtain that pre-authorization. Abby also advised that clinical updates were required on a weekly basis throughout the hospitalization.

123.   Also on March 5, 2018, at 5:02 p.m., Jo Dee McVea LaBombard of Kindred sent a 45-page fax to Medical Mutual with Kindred's internal assessment of clinical acuity for the contemplated LTAC hospital admission, along with

medical records from the STAC, in order to obtain authorization for the admission. While Medical Mutual initially denied authorization for the admission on the grounds that the Insured still required acute hospital care and could receive it at the STAC, it reversed this denial and authorized the admission to Kindred via authorization no. 1180650800. This authorization was not qualified in any manner.

124.    At no time during any of Kindred's communications with Medical Mutual did Medical Mutual advise it that it was handling the Insured differently than other members and that it would cut off coverage within a specific and brief period of time if the Insured had not been weaned from the ventilator (or was not expected to wean from the ventilator) or had not shown marked neurological improvement, regardless of whether other standard criteria for medical necessity were present.

125.    Medical Mutual intentionally provided this information and took these steps for the guidance of Kindred in connection with services to be provided to the Insured.

126.    Due to Medical Mutual's failure to exercise reasonable care or competence in communicating this information, Medical Mutual's representations were false. Medical Mutual obviously knew about the internal meetings it had to discuss the Insured as a "high dollar" patient, had access to its own records and policies and knew or should have known all relevant facts regarding its own intentions to pay for the Insured's care and treatment.

127.   As a third-party health care provider, Kindred was an entity for whose benefit and guidance Medical Mutual intended to supply this verification, authorization, and payment information so that Kindred could decide whether to admit and treat the Insured.  Medical Mutual in fact intended this information to influence Kindred in this decision.

128.   In reliance on Medical Mutual's misrepresentations, Kindred admitted the Insured into its hospital and provided him with care and treatment.  Kindred's reliance was justifiable in light of Medical Mutual's representations as to coverage and the terms of payment.  Medical Mutual had superior knowledge regarding its intent to pay for the Insured's medical care and the terms under which it would make payment, and Kindred relied on Medical Mutual to disclose any facts that could potentially impact payment to Kindred.

129.   Yet Medical Mutual misrepresented the circumstances of coverage and payment to Kindred, and did not reveal that it was treating the Insured as a special case and would only pay for the Insured's care and treatment if certain metrics were reached, regardless of whether other standard criteria for medical necessity were present, until long after the Insured had received the care and treatment he required from Kindred.

130.   As a direct and proximate result of Medical Mutual's representations and concealments, Kindred has suffered damages in an amount exceeding $600,000.00, insofar as, among other things, it provided care and treatment to the

Insured for which it has not been compensated, was deprived of interest income on those amounts during this period of non-payment, and lost opportunity costs associated with its treatment of the Insured rather than other patients.

WHEREFORE, Kindred prays for an Order of this Court awarding it fair and reasonable damages against Medical Mutual in an amount exceeding $600,000.00 to be proven at trial, all pre-judgment and post-judgment interest on the above amounts at the maximum rate permitted by law, its costs and attorneys' fees incurred herein to the extent permitted by law, and such other and further relief as the Court deems just and proper.

## <u>COUNT V – PROMISSORY ESTOPPEL</u>

131.   Kindred repeats and realleges the allegations contained in paragraphs 1 through 79, inclusive, and incorporates the same as though set forth in full.

132.   Prior to the Insured's admission, on March 5, 2018, Mary Lubin of Kindred called Medical Mutual at 1-800-636-3621 to verify the Member's eligibility for coverage and the terms of payment, speaking with Abby.  During that conversation, Abby confirmed the Insured was eligible for coverage and that Kindred would receive payment at its First Health contract rate (80 percent of billed charges) for its care and treatment of the Insured. Abby did not disclose any exclusions or other factors that could possibly impact the payment Kindred would receive for its care and treatment of the Insured.

133.   In response to Kindred's question, Abby further advised pre-authorization for the admission was required and provided a fax number for Kindred to use to obtain that pre-authorization. Abby also advised that clinical updates were required on a weekly basis throughout the hospitalization. Medical Mutual later provided authorization for the admission and did not qualify that authorization in any way,

134.   Thus, through its verification and authorization of coverage, Medical Mutual promised Kindred it would receive payment at the First Health contract rate of 80 percent of billed charges in exchange for Kindred's provision of services to its Insured that met clinical criteria for LTAC care.

135.   Based upon Medical Mutual's representations, Kindred admitted the Insured and provided him with medical care and treatment.

136.   At no time during Kindred's pre-admission communications with Medical Mutual was Kindred advised that Medical Mutual would cut off coverage after only 30 days or so if the Insured had not yet been weaned from the ventilator or shown marked neurological improvement, regardless of whether the Insured still met InterQual criteria for continuing LTAC admission or whether other standard criteria for medical necessity were present.

137.   In making the representations set forth herein, Medical Mutual knew that Kindred would reasonably be induced to rely on such representations, in that it

would admit the Insured into its hospital and provide him with medical care and treatment.

138.   Kindred, in reasonable reliance on Medical Mutual's representations, admitted the Insured into its hospital and began providing him with medical care and treatment. Once the Insured was admitted, he could not be discharged without a safe discharge option and a physician discharge order, which did not exist until months later.

139.   Medical Mutual's promises and representations, however, were not fulfilled.  Instead, long after the Insured's discharge, Medical Mutual notified Kindred that – contrary to what it had previously represented – Kindred would not be compensated for care and treatment provided to the Insured under commonly accepted medical necessity guidelines because, variously, it considered the Insured's care to be custodial due to his neurological status or that the Insured was not expected to wean from a ventilator. Medical Mutual also refused to pay even for a date of service (April 16, 2018) that it had expressly authorized.

140.   Kindred changed its position in reasonable reliance on Medical Mutual's pre-admission representations by admitting the Insured and providing him with care and treatment, to its detriment.  As a result, injustice can be avoided only by enforcement of Medical Mutual's promises to Kindred.

141.   As a direct and proximate result of Medical Mutual's representations and false promises, Kindred has suffered damages in an amount exceeding

$600,000.00, insofar as, among other things, it provided care and treatment to the Insured for which it has not been compensated, was deprived of interest income on those amounts during this period of non-payment, and lost opportunity costs associated with its treatment of the Insured rather than other patients.

WHEREFORE, Kindred prays for an Order of this Court awarding it fair and reasonable damages against Medical Mutual in an amount exceeding $600,000.00 to be proven at trial, all pre-judgment and post-judgment interest on the above amounts at the maximum rate permitted by law, its costs and attorneys' fees incurred herein to the extent permitted by law, and such other and further relief as the Court deems just and proper.

## COUNT VI – BREACH OF WRITTEN CONTRACT – FIRST HEALTH

142.    Kindred repeats and realleges the allegations contained in paragraphs 1 through 79, inclusive, and incorporates the same as though set forth in full.

143.    At all times pertinent hereto, Kindred was a party to a contract with First Health, in which Kindred agreed to render services to prospective patients insured by those payors also contracting with First Health and to accept a discounted amount, 80 percent of billed charges, as payment for those services. Kindred also agreed in its First Health contract not to balance bill the patients or even bill them at all if the underlying payor is responsible for the charges despite any lack of payment, as Medical Mutual is here.

40

144.    Pursuant to Kindred's agreement with First Health, payors also contracted with First Health were required to make payment to Kindred at the rate set forth in Kindred's contract with First Health, 80 percent of billed charges, for services that were medically necessary.

145.    Under Kindred's First Health contract, except as specified otherwise in a policy or plan, "medically necessary" means care that is (a) medically appropriate in that health benefits exceed health risks, (b) necessary to meet health needs of the patient other than for improvement of appearance, (c) rendered in the most cost efficient manner and setting, (d) consistent with scientific guidelines, (e) consistent with diagnosis or condition, (f) required for reasons other than comfort or convenience, and (g) not experimental.

146.    Also at all times pertinent hereto, Medical Mutual was contracted with First Health.  Under Medical Mutual's First Health contract, at Supplement B paragraph 2.7, Medical Mutual was required to pay Kindred at its First Health contract rates (80 percent of billed charges) for Covered Services within 30 days of receipt of accurate and complete bills. The term, Covered Services, is defined at paragraph 11.6 as services provided to a member that are eligible for payment under the provisions of a medical plan.

147.    Clearly, hospitalization is a Covered Service since Medical Mutual both paid for a portion of Kindred's services and hospitalization is an "essential health benefit" under the Patient Protection and Affordable Care Act.

41

148.    Medical Mutual does not have a copy of the actual plan or policy that covered the Insured and thus did not cite or rely on any definition of "medical necessity" in any such plan or policy that would contravene the definition in Kindred's First Health contract in any of its denial communications. Instead, at all times pertinent hereto, Medical Mutual simply stated in such communications that it applied InterQual criteria for LTAC care in determining medical necessity.

149.    The care and treatment rendered by Kindred to the Insured met the definition of medical necessity in Kindred's First Health contract and also met InterQual criteria for LTAC hospital care. Kindred thus performed all conditions, covenants, and promises on its part to be performed under the parties' First Health contracts, except any of those which have been excused by Medical Mutual's activities as alleged herein.  Specifically, and among other things, Kindred provided medically necessary care and treatment to the Insured and submitted complete and accurate bills.

150.    Accordingly, following receipt of Kindred's claims, Medical Mutual was required to pay for care provided to the Insured by Kindred at 80 percent of billed charges within 30 days of receipt of Kindred's claims.

151.    Medical Mutual breached the Agreements by (a) failing to pay Kindred even for the care it authorized within 30 days, instead taking 90 days to make payment on one claim for authorized services and nearly a year to make payment on Kindred's second claim for authorized services; (b) failing to pay

Kindred any amount for authorized date of service April 16, 2018; and (c) failing to pay Kindred any amount for dates of service April 17 through August 9, 2018, even though the services provided on those days met InterQual criteria for LTAC care and were thus medically necessary.

152.   As a direct and proximate result of the foregoing breaches, Kindred has been damaged in an amount exceeding $600,000.00.

WHEREFORE, Kindred prays for an Order of this Court awarding it fair and reasonable damages against Medical Mutual in an amount exceeding $600,000.00 to be proven at trial, all pre-judgment and post-judgment interest on the above amounts at the maximum rate permitted by law, its costs and attorneys' fees incurred herein to the extent permitted by law, and such other and further relief as the Court deems just and proper.

## COUNT VII – BREACH OF IMPLIED-IN-FACT CONTRACT

153.   Kindred repeats and realleges the allegations contained in paragraphs 1 through 79, inclusive, and incorporates the same as though set forth in full.

154.   Prior to the Insured's admission, Medical Mutual represented to Kindred that payment for services rendered to the Insured would be made pursuant to Kindred's contract with First Health.  Medical Mutual further represented to Kindred that the admission was authorized, and thus medically necessary, and that Kindred should continue to send clinical updates to Medical Mutual on a weekly basis. Medical Mutual's representations to this effect were an offer to pay Kindred

for medically necessary care and treatment provided to the Insured at the rate set forth in Kindred's contract with First Health, which is 80 percent of billed charges.

155.   Kindred accepted Medical Mutual's offer by admitting the Insured and providing him with care and treatment. As a result, the parties reached an agreement as to Kindred's provision of medically necessary care and treatment to the Insured in exchange for Medical Mutual's payment at First Health rates, and an implied-in-fact contract was formed. Pursuant to Medical Mutual's own contract with First Health, it was required to pay Kindred for covered services rendered to the Insured within 30 days of a complete and accurate bill.

156.   Kindred has performed all conditions, covenants, and promises on its part to be performed under the agreement with Medical Mutual, except those that have been excused by Medical Mutual's actions or omissions. Among other things, Kindred provided medically necessary care and treatment to the Insured, sent clinical updates to Medical Mutual on an ongoing basis, even when Medical Mutual said it was no longer necessary, and submitted claims to Medical Mutual for such care and treatment.

157.   Medical Mutual breached this implied-in-fact contract by (a) failing to pay Kindred even for the care it authorized within 30 days, instead taking 90 days to make payment on one claim for authorized services and nearly a year to make payment on Kindred's second claim for authorized services; (b) failing to pay Kindred any amount for authorized date of service April 16, 2018; and (c) failing

to pay Kindred any amount for dates of service April 17 through August 9, 2018, even though the services provided on those days met InterQual criteria for continuing LTAC care and were thus medically necessary.

158.   Medical Mutual further breached the implied covenant of good faith and fair dealing in the agreement by, among other things, failing to exercise diligence in the performance of its duties for Kindred, asserting a variety of meritless bases for its failure to pay Kindred, and wrongfully withholding payments due and owing to Kindred for its care and treatment of the Insured.

159.   As a direct and proximate result of the foregoing breaches, Kindred has been damaged in an amount exceeding $600,000.00.

160.    WHEREFORE, Kindred prays for an Order of this Court awarding it fair and reasonable damages against Medical Mutual in an amount exceeding $600,000.00 to be proven at trial, all pre-judgment and post-judgment interest on the above amounts at the maximum rate permitted by law, its costs and attorneys' fees incurred herein to the extent permitted by law, and such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

161.   Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

_____
Adrianne J. Simon (admitted *pro hac vice*)
Fultz Maddox Dickens PLC
101 S. Fifth Street, 27th Floor
Louisville, KY 40202
Telephone:  502-588-2000
Fax No.:     502-588-2020
Email:  asimon@fmdlegal.com

Richard M. Sebek
Florida Bar No. 710504
Banker Lopez Gassler P.A.
501 East Kennedy Boulevard, Suite 1700
Tampa, Florida 33602
Telephone:  (813) 222-1121
Facsimile:  (813) 222-3066
E-Mail:  rsebek@bankerlopez.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was served by electronic mail on the following counsel of record on January 18, 2024:

Eric S. Koenig, Esq.
Trenam, Kemker, Scharf, Barkin,
Frye, O'Neill & Mullis P.A.
101 E. Kennedy Blvd., Suite 2700
Tampa, FL 33602
ekoenig@trenam.com

Christopher C. Koehler, Esq.
Michael E. Smith, Esq.
Frantz Ward LLP
200 Public Square, #3000
Cleveland, OH 44114
ckoehler@frantzward.com
msmith@frantzward.com

Counsel for Defendant


_____
*Counsel for Plaintiff*